MADISON GAS & ELECTRIC COMPANY, Petitioner-Respondent, †

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Appellant.

Court of Appeals

*No. 88–0180. Argued November 17, 1988.—Decided April 13, 1989.*

(Also reported in 441 N.W.2d 311.)

---

† Petition to review denied.

---

For the appellant there were briefs by *Steven M. Schur* and *Robert J. Mussallem,* of Madison, and oral argument by *Robert J. Mussallem.*

For the petitioner-respondent there was a brief by *Richard K. Nordeng* and *Edwin J. Hughes,* and *Staf-*

*ford, Rosenbaum, Rieser & Hansen,* of Madison, and oral argument by *Richard K. Nordeng.*

Before Gartzke, P.J., Dykman and Eich, JJ.

GARTZKE, P.J. The Public Service Commission of Wisconsin appeals from circuit court orders issued in a ch. 227, Stats., review of the commission's rate order in Docket No. 3270–UR–101. The commission's order, entered on May 28, 1987, established new rates for electric and natural gas service by Madison Gas & Electric Company, beginning June 1, 1987. Shortly after the petition for review was filed, and at the company's request, the court issued a preliminary injunction which continued surcharges on the new service rates after the date the commission's order had directed their elimination.[1] On December 14, 1987, in its final order, the court determined that the commission's order constituted retroactive ratemaking, contrary to sec. 196.37(1), Stats.,[2] remanded the matter to the commission and ordered that the surcharges remain in effect until December 31, 1987. We reverse.

We resolve three issues. The first, whether the commission's order is supported by substantial evidence of record, turns on the propriety of the commission's use of a 34 percent tax rate to estimate the company's federal income tax expense. The record supports the commission's choice. The second issue is whether the commis-

[1] The commission based its new service rates on the new 34 percent federal income tax rate, and authorized surcharges for June 1987 to reflect the 46 percent tax rate in effect for that month. The court continued the surcharges and reduced them to reflect the 39.95 percent tax rate requested by the company.

[2] Section 196.37(1), Stats., authorizes the commission to "determine and order reasonable [public utility] rates. . .to be imposed, observed and followed *in the future.*" (Emphasis added.)

sion's treatment of the company's federal income tax expense constituted retroactive ratemaking. We conclude it did not. The third issue is whether the commission abused its discretion by treating the company's federal income tax expense in a manner which jeopardizes its tax benefits. We find no abuse.

A fourth issue is raised by the commission: whether the circuit court's preliminary injunction was an unconstitutional exercise of judicial ratemaking. Since we hold that the court erred on the merits when issuing the injunction, we need not reach the constitutional issue.

■ We preface our discussion by acknowledging the rule that an order of the commission is prima facie valid. The burden is on the challenger to demonstrate that service rates are unreasonable. *West Allis v. Public Service Comm.*, 42 Wis. 2d 569, 579, 167 N.W.2d 401, 406 (1969).

### 1. *Record Supports Use of 34 Percent Tax Rate*

When the company applied to increase its service rates, it prepared an analysis of its estimated revenues and operating expenses for the twelve-month period of May 1, 1987 through April 30, 1988, the "1987–88 test year." That information was subject to the commission's review and ultimately became part of the basis for the commission's service rate order. The commission's findings regarding the company's projected revenues and expenses are critical to the ratemaking process.

For ratemaking purposes, federal income tax is treated as an operating expense. Calculating the company's federal income tax for the 1987–88 test year was complicated by various factors. The company is a calendar-year taxpayer. The Tax Reform Act of 1986 reduced

189

the federal corporate income tax rate from 46 percent to 34 percent, beginning July 1, 1987. Pub. L. No. 99–514, sec. 601, 1986 U.S. Code Cong. & Admin. News (100 Stat.) 2085, 2249. A calendar-year taxpayer was required by sec. 15(a) of the Internal Revenue Code to compute its taxes for 1987 on the basis of a time-weighted composite or blended rate.[3] The blended tax rate for a 1987 calendar-year taxpayer was 39.95 percent, which we round up to 40 percent for convenience. And, as we have noted, the commission's service rate order under review was effective June 1, 1987.

When estimating the company's income tax expense for the 1987–88 test year, rather than using the 40 percent blended tax rate mandated by sec. 15(a) of the Internal Revenue Code for calendar year 1987, the commission applied a 36 percent blended tax rate for the test year. The commission calculated the 36 percent blended tax rate by using the method prescribed in sec. 15(a) of the Internal Revenue Code to determine a time-weighted composite tax rate for May 1987 through April 1988.[4]

---

[3]Section 15 of the Internal Revenue Code provides in relevant part:

(a)   If any rate of tax imposed by this chapter changes, and if the taxable year includes the effective date of the change (unless that date is the first day of the taxable year), then—

(1)   tentative taxes shall be computed by applying the rate for the period before the effective date of the change, and the rate for the period on and after such date, to the taxable income for the entire taxable year; and
(2)   the tax for such taxable year shall be the sum of that proportion of each tentative tax which the number of days in each period bears to the number of days in the entire taxable year.

[4]Since the 36 percent tax rate would only be appropriate for the 1987–88 test year, but the service rates could remain in effect indefinitely, the commission set the service rates using a 34 per-

The commission's calculation assumed corporate income tax rates of 46 percent for May and June 1987, and 34 percent for the remaining ten months.

Because the commission used the 34 percent tax rate when determining the company's income tax expense, the company contends that the service rates set by the commission are not supported by substantial evidence in the record. The company has consistently maintained that no basis exists in the record for the commission's assumption that the company would be subject to a 34 percent income tax rate for the last six months of 1987. The company claims that the commission consequently underestimated the company's 1987 tax expenses by $1.278 million. The company points to the undisputed fact that as a calendar year taxpayer, it was subject to a 40 percent blended federal income tax rate on all net taxable income earned in 1987.

A reviewing court must set aside agency action or remand the case to the agency if the court finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record. Sec. 227.57(6), Stats. The substantial evidence test is satisfied if, taking into account all of the evidence in the record, a reasonable mind could make the same finding of fact as did the agency. *Madison Gas & Elec. Co. v. Public Serv. Comm.,* 109 Wis. 2d 127, 133, 325 N.W.2d 339, 342–43 (1982). Our review is of the commission's decision and not that of the circuit court. We therefore decide for ourselves whether the substantial evidence test has been met, without deferring to the circuit court's decision.

cent tax rate, with a surcharge for the month of June which raised the effective tax rate for June 1987 to 46 percent.

The facts of record support the commission's use of the 34 percent tax rate to determine the company's income tax expense for the last six months of 1987. The 40 percent tax rate is a time-weighted composite. It reflects not only the 34 percent tax rate effective July 1, 1987, but also the 46 percent tax rate in effect for the first six months of 1987. For that reason, use of the 40 percent tax rate would overstate the company's tax expense for the last six months of the year. We approve as reasonable the commission's decision to use the 34 percent tax rate to determine the company's tax expense for the last six months of 1987.

That comparable agencies in other states have made the same decision reinforces the reasonableness of the commission's decision. See *Re Potomac Electric Power Co.*, 83 P.U.R.4th 219, 240 (Md. Pub. Serv. Comm. 1987) (commission concluded as to rates effective in May 1987, "[t]he correct blended tax rate for [service] rates set . . . should reflect the 46 percent tax rate for only the first two months of the rate-effective period, until July 1, 1987, and thereafter, a 34 percent rate. . ."); *Re General Telephone Co. of the Northwest*, 86 P.U.R.4th 626, 637 (Idaho Pub. Util. Comm. 1987) (commission approved service rate which assumed 34 percent tax rate for last six months of 1987); *Re Western Massachusetts Electric Co.*, 87 P.U.R.4th 306, 335–36 (Mass. Dept. Pub. Util. 1987) (department used 34 percent tax rate rather than 40 percent tax rate for period after July 1, 1987, because that rate reflected the tax rate in effect); and *Re Cleveland Electric Illuminating Co.*, 89 P.U.R.4th 1, 63–64 (Ohio Pub. Util. Comm. 1987) (commission applied 34 percent tax rate rather than 40 percent rate because latter "would, without a doubt, overstate" income tax

expense for period after July 1, 1987).[5]

The decisions of the Federal Energy Regulatory Commission (FERC) support the decision of the Wisconsin commission. FERC denied a utility's request for a rehearing on FERC's order directing the utility to utilize a 34 percent federal income tax rate beginning July 1, 1987. *Consolidated Edison Company of New York, Inc.,* 43 F.E.R.C. par. 61,022 (1988). The utility argued that its "actual tax rate" on 1987 income was 40 percent. FERC held that the fact that the Internal Revenue Service required use of the 40 percent rate

> does not necessarily mean that the Commission must accept the "blended" rate for ratemaking purposes. One reason is that the Commission must set rates for the future and avoid designing rates which will not be representative of the utility's true cost. . .. [W]e have permitted utilities to use the "blended" tax rate only if [service] rates were to be in effect for the entire calendar year 1987. . ..

*Id.* (footnote omitted).

In *West Texas Utilities Company,* 38 F.E.R.C. par. 61,138, at 61,369 n. 5 (1987), FERC explained that if a

---

[5]The company cites *Re Delmarva Power & Light Co.,* 85 P.U.R.4th 122, 143–44 (Del. Pub. Serv. Comm. 1987) and *Re Connecticut Nat. Gas Corp.,* 84 P.U.R.4th 428, 435 (Conn. Dept. Pub. Util. 1987) as supporting its position. We disagree. In *Delmarva,* the Delaware commission said that its staff's proposed 37 percent blended tax rate (consisting of three months at 46 percent and nine months at 34 percent) for service rates effective April 1, 1987, was both "practical and logical for ratemaking purposes," but rejected the proposal because of a possible tax consequence. 85 P.U.R.4th at 144. See our discussion in footnote 6. In *Connecticut Nat. Gas,* that state's agency correctly applied the 40 percent tax rate because the utility's "pro forma" or test year was calendar year 1987. 84 P.U.R.4th at 435.

hypothetical utility had rates in effect through March 1987 based on a 46 percent tax rate, it would not permit the utility to adopt service rates for the remaining months of the year based on a 40 percent tax rate, "since the resulting tax rate for all of 1987 would then exceed 40%."

We are aware that the District of Columbia Circuit of the United States Court of Appeals has rejected FERC's approach and impliedly that of the state commissions we have cited. *Carolina Power & Light Co. v. F.E.R.C.,* 860 F.2d 1097 (D.C. Cir. 1988). In that case the utility's service rates were effective September 1, 1987. *Id.* at 1099. The utility was a calendar-year taxpayer and proposed a 40 percent blended tax rate for the last four months of 1987. *Id.* The court rejected FERC's position that, notwithstanding the 40 percent tax rate mandated by sec. 15(a) of the Internal Revenue Code, for ratemaking purposes the tax rate applicable to income earned by the utility before July 1, 1987 was 46 percent and the rate thereafter was 34 percent. The court described FERC's position as the "equivalent to attempting to prove that the moon is made of green cheese." *Id.* at 1100. The court offered no other rationale.

In our view, FERC's position and that of the Public Service Commission of Wisconsin and comparable state agencies in Maryland, Idaho, Massachusetts and Ohio, represent a reasonable approach to matching expenses against income.

*Carolina Power* rests in part on the proposition that FERC had effectively exacted a refund on behalf of the utility's customers for excess sums paid to cover the utility's tax liability between January 1, 1987 and August 31, 1987. The court said that by permitting the utility "to recover only a portion of its actual tax liability in its wholesale electric rates from September 1, 1987 through

the end of the year, [FERC] forced a refund of a portion of its pre-September 1, 1987 rates." *Id.* at 1101.

As we show in the next part of this opinion, retroactive ratemaking is not involved in the case before us. The commission avoided an overcollection in the last six months. By imposing a surcharge for June 1987 to bring the effective tax rate up to 46 percent for that month, it preserved to the utility its pre-July earnings resulting from a service rate predicated on the 46 percent tax rate.

In short, we disagree with the "green cheese" rationale for the *Carolina Power* decision and conclude that to the extent it rests on retroactivity considerations, that factor is not present here. Consequently, we do not consider *Carolina Power* to be controlling.

We conclude that substantial evidence of record supports the commission's use of the 34 percent tax rate.

2. *Retroactive Ratemaking Not Involved*

In the absence of statutory authority, the commission has no power to fix utility rates having retroactive application or effect. *Friends of Earth v. Public Service Commission,* 78 Wis. 2d 388, 411, 254 N.W.2d 299, 308 (1977); *Wisconsin Telephone Co. v. Public Service Comm.,* 232 Wis. 274, 303, 287 N.W. 122, 137 (1939), *cert. denied,* 309 U.S. 657 (1940); *Milwaukee v. West Allis,* 217 Wis. 614, 620, 258 N.W. 851, 853 (1935). The company contends, and the circuit court agreed, that the commission engaged in retroactive ratemaking.

Adjustments to future rates to rectify undue past profits is retroactive ratemaking. The commission cannot install lower rates to recapture a utility's excess profits in the past. *Wisconsin Telephone Co.,* 232 Wis. at 303, 287 N.W. at 137. Similarly, rates may not be reduced to make up for taxes the utility did not incur

because of a change in the tax law while prior service rates were in effect. *State ex rel. Utilities Commission v. Edmisten,* 232 S.E.2d 184, 194–95 (N.C. 1977).

The circuit court concluded that the commission intended through its new rates to wipe out any unanticipated earnings the company would have enjoyed under its old service rates from January 1 through May 31, 1987 by virtue of the reduction in the federal income tax rate from 46 percent to 34 percent.

The court relied for this conclusion on the following paragraph in the commission's order:

> The Tax Reform Act of 1986 lowers the federal corporate income tax rate from 46% to 34% effective July 1, 1987. The company has requested an effective tax rate of 40% for the period of May 1–December 31, 1987. The commission has determined that the use of the company's proposed rate would result in an overcollection from the ratepayers for calendar year 1987. Under current rates, the company will have recovered for income taxes at an effective rate of 46% from January 1 to May 31, 1987 (it is assumed that new rates will go into effect on June 1, 1987). The commission has determined that the revenue requirement for the test year should be based on the 34% federal income tax rate that goes into effect on July 1, 1987, with an incremental surcharge added for the period June 1 through June 30 bringing the effective rate for June up to 46%. The effect of this treatment, including the surcharge for the month of June, will provide recovery of federal income taxes for calendar 1987 at an effective rate of 40% on an annual basis. To comply with federal normalization requirements, the tax savings depreciation reflects the respective income tax rates.

We disagree with the reasoning of the circuit court. As we have noted, the 40 percent tax rate mandated by

the Internal Revenue Code for calendar-year taxpayers is a timeweighted composite. It spreads throughout calendar year 1987 the effect of both the 46 percent tax rate applicable January 1 through June 30 and the 34 percent tax rate applicable July 1 through December 31, 1987. Had the company's new service rates been effective January 1, 1987, use of the 40 percent composite tax rate to determine the company's tax expense for that entire year would have accurately reflected the actual 46 percent and 34 percent tax rates. *See Consolidated Edison of New York,* 43 F.E.R.C. par. 61,022, at 61,064. But to apply the 40 percent composite tax rate when setting service rates effective after July 1, 1987 would be to allow the 46 percent tax rate to inflate the company's tax expense for the balance of 1987.

Because the new service rates were effective June 1, 1987, applying the company's proposed 40 percent tax rate to determine its tax expense would indeed, as the commission said, have resulted in "an overcollection from the ratepayers for calendar year 1987." The overcollection would have occurred in the last six months of 1987. Avoiding an overcollection under future service rates is not retroactive ratemaking.

It is undisputed that the surcharges added to the new service rates for the period through June 30, 1987 brought the effective income tax rate up to 46 percent for that month. This was necessary to preserve to the company the benefit of the full income tax expense it would have for that month. Eliminating the surcharges at the end of that month reduced the effective tax rate thereafter to 34 percent. But that elimination simply prevented the company from overcollecting during the months of July through December 1987. Again, avoiding an overcollection under future service rates is not retroactive ratemaking.

197

We conclude that the circuit court erred by issuing the preliminary injunction and final order continuing the surcharges beyond June 30, 1987 through December 31, 1987.

### 3.  *Jeopardy to Tax Benefits*

The company asserts that the commission's order puts at risk nearly $40 million in federal tax benefits the company could otherwise enjoy. It asserts that the commission's order is therefore unreasonable and should be set aside as an abuse of discretion.

As explained by the company, under the Internal Revenue Code, public utilities may take advantage of accelerated methods of depreciation only if they use the "normalization" method of accounting for ratemaking and financial reporting purposes, as defined in secs. 167(1) and 168(c)(3)(B) of the Code. Under normalization accounting, a utility computes its actual income tax liability utilizing accelerated depreciation. At the same time, the utility's regulatory agency computes the utility's income tax expense for ratemaking purposes using straight-line depreciation. The difference between the utility's current federal income tax expense and the amount established for ratemaking purposes must be accounted for in a depreciation reserve account, known as "tax savings depreciation" or TSD. The company contends that the commission's "underestimating" its federal income tax rate will result in a smaller contribution to the company's TSD account than if the commission had used the 40 percent tax rate for ratemaking purposes.

According to the company, if the Internal Revenue Service determines that the normalization rules were

violated by the commission's tax treatment, the company would lose the right to accelerated depreciation, not only as to its current tax returns but also as to those still "open" with IRS. This would cost the company about $40 million in lost tax benefits.

The company does not contend that the order under review will definitely result in the loss of $40 million in tax benefits. It concedes that whether normalization rules are violated is an issue on which reasonable persons can differ, and the Internal Revenue Service has not spoken specifically to the issue. The company concludes, however, with the disturbing thought that because the financial repercussions resulting from an error by the commission could be so great, the commission's decision to run the risk is highly imprudent, an arbitrary use of its power, and an abuse of its discretion. We reject the company's argument.

The implication that the courts should apply a financial risk analysis when reviewing administrative decisions is unacceptable. Many decisions of administrative agencies have serious consequences. Courts are not permitted to find that an agency has abused its discretion merely because substantial financial consequences may attend an error not shown to exist but the possibility of which cannot be absolutely excluded. The legislature has assigned to agencies the right to make discretionary decisions. The right to make discretionary decisions includes "a limited right to be wrong." *State v. Pharr,* 115 Wis. 2d 334, 345, 340 N.W.2d 498, 502–03 (1983).

In contrast, the legislature has assigned to the courts a highly restricted power to review discretionary decisions by agencies. A court cannot reverse or remand a case to an agency unless the court finds

that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice. . .; or is otherwise in violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion.

Sec. 227.57(8), Stats.

The commission exercised its discretion with respect to the normalization rules. In its discussion of tax rates, which we have already quoted, the commission noted that the new service rates, including the June surcharges, provided recovery for federal income taxes at a 40 percent rate for the calendar year, and that to comply with normalization requirements, "the tax savings depreciation reflect[ed] the respective income tax rates." We cannot find that a basis exists under sec. 227.57(8), Stats., for us to reverse the commission's decision.[6]

FERC has satisfied itself that the approach to the normalization requirements taken by the commission does not violate those requirements. See *Rate Changes*

---

[6]We do not imply that commission would have abused its discretion had it, to avoid any risk that the company would otherwise lose a tax benefit, accepted the company's position regarding normalization. Which is the wiser course—that proposed by the company or the commission's staff—is for the commission to decide. The Delaware commission chose the company's proposal. *Delmarva,* 85 P.U.R.4th at 144. The Delaware commission said,

> Should Delmarva be found in violation of the normalization requirements, the tax consequences to Delmarva and its ratepayers would be horrendous. It could apply to all open tax years (for Delmarva, 1982 to date), and would involve tens of millions of dollars in taxes. The stakes here are too large to require Delmarva to gamble with tax law on this issue. As between two bad alternatives, the tax allowance overcollection for three months is far, far the lesser of two evils.

*Id.*

*Relating to Federal Corporate Income Tax Rates for Public Utilities,* 52 Fed. Reg. 24,987 (1987) (later codified at 18 C.F.R. secs. 35.13 and 35.27) (normalization satisfied either by use of 46 percent rate for first half and 34 percent for second half of 1987, or by use of 40 percent for full year, "since the total amounts for the year under either approach would be the same," and straight-line depreciation does not depend on seasonal revenues).

■ FERC's opinion on tax questions cannot bind the Internal Revenue Service or the courts. FERC, however, has about 175 utilities subject to its jurisdiction. 52 Fed. Reg. at 24,988. FERC must have concluded that those utilities risk no loss of tax benefits through use of the 34 percent tax rate for the last half of 1987. Knowledge of FERC's conclusion lessens the discomfort the company's normalization argument initially caused in this appeal.

### 4. *Conclusion*

For the reasons we have stated, the circuit court erred when it issued the preliminary injunction and when it rendered its final decision, which in combination continued the June 1987 surcharges imposed by the commission through the end of that calendar year. We therefore reverse the orders of the circuit court and direct it to remand the matter to the commission for such further proceedings as may be necessary. Our disposition makes unnecessary any discussion of the commission's contention that the court unconstitutionally exercised ratemaking powers when it ordered the surcharges continued.

*By the Court.*—Orders reversed and cause remanded for further proceedings consistent with this opinion.

DYKMAN, J. *(dissenting)*.   The crux of the issue raised by this appeal is shown by the testimony of a staff witness for the commission:

> [M]y tax rate was developed using the new rates as prescribed by the Tax Reform Act of 1986, namely a 34 percent tax rate effective July 1st, 1987. Therefore, I took the months in the test year after June 30th, 1987, and used a 34 percent tax rate for those months. The months prior to July 1, 1987, I used a 46 percent tax rate. I took an average of those 12 months and come up with a composite rate of 36 percent for federal income taxes.

The tax reform act changed corporate tax rates from 46 percent to 34 percent, effective July 1, 1987. Because the company is a calendar year taxpayer, its 1987 tax rate was neither 46 percent nor 34 percent, but a blended rate. Simplified, that rate for a calendar year taxpayer was the average of one-half year at 46 percent and one-half year at 34 percent. However, income taxes are calculated yearly, not monthly or semiannually. Thus, the Internal Revenue Service required the company to pay income tax on its 1987 net income at a 40 percent rate.

There is no way to avoid this method of calculating federal income taxes. The Internal Revenue Service deems it irrelevant that more or less income might be earned in one month, one quarter, or one six-month period. Therefore, neither the commission nor the majority can dispute that the company paid federal income taxes of 40 percent of its net income earned in 1987. Nor can it be disputed that for the calendar year 1988, the company paid federal income taxes of 34 percent of its net income.

The commission did not concern itself with the tax rate that the company actually would pay on 1987 net income. Instead, it applied tax rates to monthly income,

a method not possible in the real world. "The ultimate test of a formula is whether it bears a reasonable relationship to reality and conforms to state and federal laws and constitutions." *Soo Line R. Co. v. Department of Revenue,* 89 Wis. 2d 331, 341, 278 N.W.2d 487, 492 (Ct. App. 1979), *aff'd as modified on other grounds,* 97 Wis. 2d 56, 292 N.W.2d 869 (1980). The commission's formula assumed that the company would pay federal income taxes at a 34 percent tax rate from July 1, 1987 to December 31, 1987. That assumption bears no relationship to reality. In reality, the company paid 40 percent of its net income during that time as federal income taxes. Merely because the commission and the majority assert that the company paid taxes at a lesser rate does not make it so.

During the company's test year, it paid federal income taxes for eight months of 1987 at a 40 percent rate, and for four months of 1988 at a 34 percent rate. No one explains how this results in a 36 percent composite rate. If the company filed income tax returns every six months, reflecting income and expenses for the preceding six months, the commission's position would make sense. As everyone agrees, however, that method of paying income taxes is fictional.

The majority, faced with the task of sustaining the equivalent of a commission finding that $2 + 2 = 5$, reasons that because the 40 percent rate is a blended rate, use of that rate would overstate the company's tax expense.[1] That is no more a reason to sustain the com-

---

[1] The majority gives no explanation of *why* a blended tax rate overstates the company's tax expense. Indeed, the Internal Revenue Service not only accepted, but required that rate. If use of a particular tax rate would overstate an actual expense, one would expect the Internal Revenue Service to prohibit the use of that rate, not require it.

mission than to conclude that its opinion is correct because it was written on Tuesday. It just sounds better. Or, as the Court of Appeals for the District of Columbia Circuit put it, in a case indistinguishable from the one we are deciding:

> FERC suggested in its brief, and its counsel asserted repeatedly at argument, that—section 15(a) of the Internal Revenue Code notwithstanding—the tax rate applicable to income earned by CP & L prior to July 1, 1987 was 46% and the rate thereafter, 34%. This strikes us as equivalent to attempting to prove that the moon is made of green cheese by asserting it several times in quick succession. CP & L did not— and was plainly not entitled to—file two returns in calendar year 1987, one for the first six months and another for the last six. The petitioner filed one return, and for purposes of that return a single corporate income tax rate of 40% was applicable to income earned before *and after* the July 1, 1987 effective date of the statutory change.

*Carolina Power & Light Co. v. F.E.R.C.,* 860 F.2d 1097, 1100 (D.C. Cir. 1988) (emphasis in original).

*Carolina Power* is the only appellate decision addressing the issue about which the company and the commission disagree. Because *Carolina Power's* holding is contrary to the majority's mandate, *Carolina Power* must be reckoned with. The majority declines to follow *Carolina Power* for two reasons: (1) the case was unreasoned, because its decision was based on the proposition that the moon is (or is not) made of green cheese; and (2) the *Carolina Power* case is based on concepts of retroactive ratemaking, an issue not present in this case.

Both reasons the majority uses to distinguish *Carolina Power* are incorrect.

### Green Cheese—Unreasoned Decision

The *Carolina Power* opinion has nothing to do with green cheese. Instead it examines the Federal Energy Regulatory Commission's assertion that Carolina Power & Light paid its 1987 federal income tax at a rate of 46 percent prior to July 1, 1987 and at a rate of 34 percent after that date. *Carolina Power,* 860 F.2d at 1100. The *Carolina Power* court observed that the Internal Revenue Service would only permit Carolina Power & Light, a calendar year taxpayer, to pay its 1987 income taxes as sec. 15(a) of the Internal Revenue Code required, that is, at 40 percent of its 1987 income. *Id.* The *Carolina Power* court found FERC's assertion, i.e., that Carolina Power & Light paid federal income taxes at a 34 percent rate for the second half of 1987, to be whimsical, and concluded that FERC's order failed for want of an articulated rational basis. *Id.* at 1104.

I cannot join in the majority's assertion that other than a comment on the moon's composition, "[t]he [District of Columbia Circuit] court offered no other rationale [for its holding]." Majority opinion at 194. I believe that the court gave a reason for its decision, and I agree with that reason.

### Retroactive Ratemaking

The majority asserts that the *Carolina Power* decision was based on retroactive ratemaking considerations. The short answer to this is that the *Carolina Power* court rejected this notion:

> As petitioner observes, FERC has made no finding that petitioner profited excessively during the first eight months of 1987. Indeed, petitioner suggests that were the Commission to conduct an overall evaluation of CP & L's profitability during early 1987, no

205

such finding could be made. This issue, of course, we cannot resolve, for the Commission did not frame its disposition in this case as a refund action, and we are thus not presented with a sufficient record to test the Commission's application of *West Texas* to CP & L's filing as an instance of retroactive ratemaking.

*Carolina Power,* 860 F.2d at 1104. (Footnotes omitted.)

A more complete answer is that in the present case, the commission's use of nonexistent tax rates *did* constitute retroactive ratemaking. Therefore, if the majority is correct that retroactivity considerations are the basis for the *Carolina Power* decision, this case and *Carolina Power* are even more alike.

When the company's old service rates were set, its federal income tax expense was estimated using a 46 percent rate. The old rates continued until May 31, 1987. Because the company's actual tax rate for the first five months of 1987 was 40 percent, it enjoyed a greater return than predicted, all other income and expense estimates being accurate. This is an unfortunate, but nonetheless a necessary implication of a system that prohibits retroactive ratemaking. However, the theory behind that prohibition is realistic. Unexpected changes in income and expenses will favor a utility on some occasions, and favor customers on other occasions. Over time, inequities will even out, leading to justice for both customers and the utility.

The trial court examined the commission's reasons for using a nonexistent tax rate, and considered whether this procedure implicated retroactive ratemaking:

> The PSC briefly argues that "[W]hile it is true that the Commission was concerned about the possibility that overcollection of federal income tax expense that might result from the use of the Company's method, it does not follow that the method

actually adopted by the Commission involved retro-active ratemaking." (Reply Brief at p. 14) Despite this statement, the clear language of the order is that the commission intended to prevent overearning in calendar year 1987, and that it sought to reach that result by setting rates for the test year that result in a 40% tax recoupment for the calendar year—even though rates already collected during the first part of 1987 were uncontroverably [sic] based on a final order of the PSC that used a 46 percent tax recoupment rate. I am not sure that this action can be better described than by virtue of the language used by the Wisconsin Supreme Court when it reiterated the rein on the PSC's ratemaking power: "[T]he Commission may not. . .make a rate sufficiently low to recapture the excesses." *Wisconsin Telephone Co. v. PSC,* 232 Wis. 274, 303 (1939).

The commission's decision leaves no question but that the trial court was correct:

> The company has requested an effective tax rate of 40% for the period of May 1–December 31, 1987. *The commission has determined that the use of the company's proposed rate would result in an overcollection from the ratepayers for calendar year 1987.* Under current rates, the company will have recovered for income taxes at an effective rate of 46% from January 1 to May 31, 1987 (it is assumed that new rates will go into effect on June 1, 1987). (Emphasis supplied.)

The commission was undoubtedly correct that the company's use of a 40 percent rate for 1987 would result in an overcollection for that year. A previous and now-inaccurate estimate of the company's first-half federal income tax expense caused 1987's overcollection. However, the commission's decision was dated May 28, 1987, and became effective on June 1, 1987. Therefore, the

effects of federal income tax rates in effect before June 1, 1987 could not be used to justify a fictional and lower estimate of the company's second half 1987 federal income taxes. When the commission did so, it set rates retroactively.

If, as the majority asserts, *Carolina Power* was really a retroactive ratemaking case, then the holding of *Carolina Power* is that the accounting method used by FERC constituted retroactive ratemaking. In this case, the commission used the identical accounting method used by FERC in the *Carolina Power* case. The conclusion is inescapable: the commission's treatment of the company's federal income tax expense constituted retroactive ratemaking, an act the commission concedes it may not do.

In reality, the commission was attempting to correct for a flaw inherent in the practice of using a test year to predict income and expenses. Some items of income and expense are necessarily unknowable until they accrue. Thus a utility's income may be altered by unexpected weather patterns, but an estimate of income based on normal weather patterns is acceptable for a test year. This is because no better way of predicting the future can be devised.

Federal income taxes are different. It seems strange to "estimate" taxes for a future test year when, absent action by congress, future rates are a certainty. Yet, if a "test year" is used to predict the future, the "test year" concept requires that actual, not fictional figures be used. Therefore, though the company and the commission both knew that tax rates in the test year would *not* be the same as in future years, the concept of using a test year as predictive of future years was not abandoned. If the commission wished to change the rules by which the

game was played, it should not have done so in the middle of the fifth inning.

Because it used the "test year" method of setting rates, but ignored the actual tax rate in effect during the test year, the commission's conclusion is irrational. I agree with the trial court that the commission's reason for its order was in part to recapture what it believed were the company's past excesses. I would therefore affirm the trial court's remand for further commission action.