Ho-Chunk Nation, Petitioner-Appellant-Petitioner,

v.

Wisconsin Department of Revenue,
Respondent-Respondent.

Supreme Court

*No. 2007AP1985. Oral argument February 5, 2009.
—Decided June 16, 2009.*

2009 WI 48

(Also reported in 766 N.W.2d 738.)

For the petitioner-appellant-petitioner there were briefs by *Thomas M. Pyper, Michael P. Murphy, Cynthia L. Buchko,* and *Whyte Hirschboeck Dudek, S.C.,* Milwaukee, and oral argument by *Michael P. Murphy.*

For the respondent-respondent there was a brief and oral argument by *F. Thomas Creeron III,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. N. PATRICK CROOKS, J. This review of a published court of appeals decision[1] involves the Ho-Chunk Nation's appeal of a denied claim for a tax

---

[1] *Ho-Chunk Nation v. DOR,* 2008 WI App 95, 312 Wis. 2d 484, 754 N.W.2d 186.

refund under Wis. Stat. § 139.323(3) (2005–06).[2] The statute authorizes partial refunds for cigarette taxes provided the tax was collected on sales made on land that "was designated a reservation or trust land on or before January 1, 1983." At issue is whether the land on which the relevant sales took place satisfies that portion of the statute. The land was approved for purchase in August 1982 and formally accepted by the United States government on January 31, 1983. The question on which this case turns is at what point a particular parcel of land "was designated . . . trust land" for purposes of Wis. Stat. § 139.323.

¶ 2. The court of appeals determined that land cannot be held in trust until formal acceptance occurs and that in order to satisfy the tax refund statute's requirements, land must be held in trust on or before January 1, 1983. Because formal acceptance of the property in question here did not occur until after that date, the court of appeals held that the claim for a refund was properly denied. This was the same result that had been reached by the Wisconsin Department of Revenue (DOR), the Wisconsin Tax Appeals Commission (the Commission), and the circuit court. The Ho-Chunk Nation sought review.

¶ 3. For the reasons set forth below, we affirm. "[R]eservations or trust lands" are also referred to in the sentence preceding the provision in question; a sensible reading of the statute (Wis. Stat. § 139.323) requires that the two references be read as identifying the same land. The grammatical construction of the sentence itself lends further support to our holding because "was designated" precedes both "a reservation"

[2] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

and "trust land" and means the same thing about each. Given that there is no basis in the federal regulations for recognizing a preliminary, unofficial status for reservations or trust lands, there is likewise no basis for reading this statute as intending to apply to land that has received only preliminary informal approval.

¶ 4.   We therefore hold that in this context the phrase "was designated a reservation or trust land" is necessarily read as referring to the applicable formal process that must occur in order for land to be a reservation or trust land. Because the proper authorities had not completed the necessary steps for the property in question to be designated a reservation or trust land on or before January 1, 1983, and because that is required in order to qualify for the tax refund, the claim was properly denied.

## I. BACKGROUND

¶ 5.   The question on which this case turns is at what point a particular parcel of land "was designated . . . trust land" for purposes of Wis. Stat. § 139.323, and because the parties differ as to when that happened, it is necessary to lay out, briefly, the process through which the land at issue came to be trust land.

¶ 6.   In 1982 the Ho-Chunk Nation (the Nation), a federally recognized Indian tribe, received permission from the United States Department of the Interior, Bureau of Indian Affairs (BIA), to acquire a five-acre parcel of land known as the DeJope Property. A Washington, D.C., BIA official sent a memo dated August 20, 1982, to a Minneapolis BIA official, stating in relevant part, "You are, therefore, authorized to accept conveyance to the United States in trust upon consideration of

appropriate title evidence in accordance with the requirements of 25 CFR 120a.12 [1982]." On October 29, 1982, the seller of the DeJope Property received payment from the Nation and conveyed the title by delivery of a warranty deed. On January 31, 1983, the Minneapolis BIA Area Director signed the deed, accepting the conveyance. The deed was recorded with the Dane County Register of Deeds on March 18, 1983.

¶ 7.  When the Nation filed claims with the DOR requesting a refund of 70 percent of the taxes paid on cigarette sales at the DeJope Property for periods during 2003 and 2004, the claims were denied. The DOR denied the claims because "the [DOR] must accept the date of January 31, 1983[,] as the date the DeJope land was 'designated' for the purposes of § 139.323, Wis. Stats." As a result, the DOR determined that the DeJope Property did not meet the statutory requirements in order to receive the requested refund.

¶ 8.  The Nation filed an appeal of the decision with the Tax Appeals Commission. In a ruling and order issued on February 15, 2006, the Commission granted summary judgment in favor of the DOR.

¶ 9.  The Nation petitioned the Dane County Circuit Court for review. The circuit court, the Honorable Sarah B. O'Brien presiding, affirmed.

¶ 10.  The Nation then filed an appeal, and the court of appeals affirmed. *Ho-Chunk Nation v. DOR,* 2008 WI App 95, 312 Wis. 2d 484, 754 N.W.2d 186. The court of appeals concluded that "the United States government does not hold the land in trust until formal acceptance under 25 C.F.R. § 151.14 (2007) occurs. Because this did not occur with respect to the DeJope property until after January 1, 1983, the Ho-Chunk

Nation is not entitled to a refund." *Id.*, ¶¶ 2, 36. The Nation petitioned for review, and this court granted the petition.

## II. STANDARD OF REVIEW

¶ 11. This case requires statutory interpretation, and the standard of review for statutory interpretation is de novo. *DOR v. Menasha Corp.*, 2008 WI 88, ¶ 44, 311 Wis. 2d 579, 754 N.W.2d 95.

¶ 12. In a case that involves a ruling by the Commission, we review the Commission's decision rather than the decision of the circuit court. *Id.*, ¶ 46. Like *Menasha,* this case involves review of an agency action so the question arises as to whether any deference is due, and if so, what level applies. In *Menasha,* this court said the agency to which deference is due is the Commission, and the level of deference as to the Commission's interpretation of statutes is one of three levels: great weight, due weight, or no deference. *Id.*, ¶¶ 47–49.

¶ 13. In its written ruling, the Commission stated, "The specific issue before us is one of first impression." "No deference is given to the agency's statutory interpretation when the issue is one of first impression, the agency has no experience or expertise in deciding the legal issue presented, or the agency's position on the issue has been so inconsistent as to provide no real guidance." *Menasha,* ¶ 50. We therefore review the ruling of the Commission in this case giving no deference to the agency's statutory interpretation.

## III. DISCUSSION

¶ 14.   Wisconsin Stat. § 139.323 authorizes refunds of cigarette taxes to Indian tribes "in respect to sales on reservations or trust lands" when certain conditions are met. The DOR denied the tax refund claim in this case on the grounds that the claim was for sales on land that did not meet the third condition:   that "[t]he land on which the sale occurred was designated a reservation or trust land on or before January 1, 1983." As we noted previously, that denial was affirmed by the Commission.

¶ 15.   There is no dispute that the DeJope Property is now trust land; the dispute is whether it was so designated prior to the January 1, 1983, deadline such that taxes of cigarette sales on that property meet the statute's conditions and may be refunded to the Nation. The Commission ruling stated, "Although the parties did not stipulate to the facts in this case, they do not dispute any material facts. . . . Furthermore, the Department does not dispute that the Tribe's refund Claim satisfies all of the requirements of Wis. Stat. § 139.323 except one, which is that the land on which the cigarette sales occurred must have been 'designated a reservation or trust land on or before January 1, 1983.' "

¶ 16.   The DOR, in urging us to affirm the decision of the Commission, argues that the language "was designated" refers to the official process described in the fee-to-trust regulations spelled out in the Code of Federal Regulations (C.F.R.). This process has several steps and is completed, according to the C.F.R., when the land is formally accepted into trust. The DOR argues that this occurred with respect to the land in question on January 31, 1983, and as a result, there is no entitle-

ment to a refund under the statute. The DOR bases its argument on the applicable regulations, 25 C.F.R. §§ 151.12 and 151.13 (1982):

> 25 C.F.R. § 151.12 If the Secretary determines that he will approve a request for the acquisition of land from unrestricted fee status to trust status, he shall acquire, or require the applicant to furnish, title evidence . . . . After having the title evidence examined, the Secretary shall notify the applicant of any liens, encumbrances, or infirmities which may exist. The Secretary may require the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition and he shall require elimination prior to such approval if the liens, encumbrances, or infirmities make title to the land unmarketable.

> 25 C.F.R. § 151.13 Formal acceptance of land in trust status shall be accomplished by the issuance or approval of an instrument of conveyance by the Secretary as is appropriate in the circumstances.

¶ 17. The DOR further argues that if this court finds the statute ambiguous, we should resolve the question in its favor, applying the exemption canon of construction, which generally requires a strict reading of statutes having to do with exemptions, refunds and other tax privileges.

¶ 18. The Nation argues that the DeJope Property was designated trust land in August 1982,[3] when the Washington BIA official authorized the local BIA

---

[3] The Nation argues in the alternative that another act satisfies the requirement that the land be designated trust land on or before January 1, 1983. The Nation argues that, at the latest, the land was designated trust land on December 7, 1982, the date on which the Great Lakes BIA office sent a memo and forwarded the deed—signed only by the seller at that point—to the Minneapolis office. The memo states that the deed is enclosed "for approval." The argument that this act constitutes designat-

official "to accept conveyance" of the property. The Nation argues that the word "designated," when given its ordinary meaning, should be understood to mean "set apart for a purpose or duty," and that the land was set apart for the purpose of being trust land at the point when the BIA authorized its conveyance.

¶ 19. The Nation argues, in the alternative, that if the statute is ambiguous, we should apply the "Indian canon of construction," which requires that ambiguity be resolved in a tribe's favor when a statute is applied to an Indian tribe.

¶ 20. The first question, then, is whether the statute is ambiguous.

¶ 21. The Commission held that Wis. Stat. § 139.323 is not ambiguous, citing to a 1985 opinion of the Attorney General concerning the statute.[4]

¶ 22. The circuit court and court of appeals said it is.[5] In their analysis, both courts cited the fact that there are multiple definitions of the word "designate."

---

ing the land as trust land is unpersuasive for the same reasons that the first argument is unpersuasive; the December 7, 1982, memo merely represents a different point in the pre-approval process.

[4] The Commission said, "The specific issue before us is one of first impression. However, in addressing a different question under the same statute, the Attorney General of Wisconsin opined that Wis. Stat. § 139.323 is not ambiguous. . . . We also find that Wis. Stat. § 139.323 is not ambiguous, and therefore must be interpreted according to its plain meaning." However, the Attorney General opinion cited, 74 Wis. Op. Att'y Gen. 134 (1985), has to do with another issue and reaches no conclusion specifically as to the statute's requirement that sales occur on land that was designated a reservation or trust land on or before January 31, 1983.

[5] The circuit court said, "Both of these meanings are reasonable, which is borne out by the definitions of 'designate'

¶ 23. However, the existence of multiple defini-
tions does not mean that in a particular context a word
is ambiguous. As we noted in *Kalal*:

> Many words have multiple dictionary definitions; the
> applicable definition depends upon the context in which
> the word is used. Accordingly, it cannot be correct to
> suggest, for example, that an examination of a statute's
> purpose or scope or context is completely off-limits
> unless there is ambiguity. It is certainly not inconsis-
> tent with the plain-meaning rule to consider the intrin-
> sic context in which statutory language is used; a
> plain-meaning interpretation cannot contravene a tex-
> tually or contextually manifest statutory purpose.

*State ex rel. Kalal v. Circuit Court for Dane County,*
2004 WI 58, ¶ 49, 271 Wis. 2d 633, 681 N.W.2d 110.

¶ 24. Other courts have also noted that dictionar-
ies provide minimal help in a determination of ambigu-
ity. As one court noted:

> While dictionaries may be helpful to the extent they set
> forth the ordinary, usual meaning of words, they pro-
> vide an inadequate test for ambiguity. To allow the

found in The American Heritage Dictionary of the English
Language (4th ed. 2000)." The court of appeals noted that
dictionary definitions of the word led to opposite
interpretations: "The definitions the Nation chooses—'select'
and 'nominate,' *see Black's Law Dictionary* 447 (6th ed. 1990)
—have a preliminary sense to them that would support the
Nation's proposed construction. However, the definitions
'specify,' 'give a name or title to,' and 'characterize,' *see American
Heritage College Dictionary* 376 (3d ed. 1993), suggest that the
property would need to actually be held in trust before the
property could be so specified, named, titled or characterized."
*Ho-Chunk Nation,* 312 Wis. 2d 484, ¶ 16.

existence of more than one dictionary definition to be the *sine qua non* of ambiguity would eliminate contextual analysis of contractual terms; any time a definition appeared in a dictionary of whatever credibility or usage, that definition could be said to be "reasonable" and thus render many, if not most, words ambiguous. Dictionaries define words in the abstract, while courts must determine the meaning of terms in a particular context . . . .

*Gulf Metals Indus., Inc. v. Chicago Ins. Co.,* 993 S.W.2d 800, 805–06 (Tex. Ct. App. 1999).

¶ 25. This is a point that is easily observed in common usage—the fact that the word "tip" has multiple meanings does not render the sentence "police received a tip" ambiguous. For that matter, the word "reservation" itself has multiple meanings, but in context it is unambiguous.

¶ 26. Here, there are two ways the context of the statute renders the provision unambiguous notwithstanding the multiple dictionary definitions of the verb "to designate."[6]

---

[6] We note that no legislative history has been proffered by either party to shed further light on the terms at issue here. The circuit court said, "Unfortunately, the legislative history does not shed any light on this ambiguity." The court of appeals said, "The parties have presented us with no legislative history regarding Wis. Stat. § 139.323." *Ho-Chunk Nation,* 312 Wis. 2d 484, ¶ 18. The Commission cited no legislative history in its ruling that the statute was unambiguous. It favorably cited a 1985 opinion of the Attorney General, 74 Wis. Op. Att'y Gen. 134 (1985), which addressed a different question about Wis. Stat. § 139.323 and opined on the legislative history relevant to that question; however, that opinion does not address the question raised here and does not assist in our analysis.

The dissent carefully examines legislative history but stops short of identifying anything that documents the legislature's intent for the DeJope Property to be subject to the tax refund.

¶ 27.  First, the surrounding text of the statute refers to lands that have the status of reservation and trust land, giving an indication that the rest of the statute should also be read that way. The language in the statute that precedes the enumerated conditions states:

Refunds to Indian tribes. The department shall refund 70% of the taxes collected under s. 139.31(1) in respect to sales on reservations or trust lands of an Indian tribe to the tribal council of the tribe having jurisdiction over *the reservation or trust land on which the sale is made* if all the following conditions are fulfilled . . . .

Wis. Stat. § 139.323 (emphasis added).

¶ 28.  In the enumerated conditions, the further condition is set forth that the land on which the sale occurred "was designated" trust land before a specific date, January 1, 1983. We agree with the court of appeals that there is no reason to read the two parts of the statute as referring to different requirements for the land. The first part of the statute refers to sales on land that has the status of reservation or trust land, and the second part of the statute simply limits the refund to taxes collected on sales that occurred on land that had that status on or before the specified date.

¶ 29.  Second, in the sentence we construe, the verb (in the passive construction, "was designated") connects the subject ("the land on which the sale occurred") to two subjective complements ("a reservation" and "trust land"). Ordinarily, "was designated" would be understood to apply in the same way to each

---

The legislature was free (and of course remains free) to take a different approach—a simple edit would suffice to broaden the scope of this statute in such a way that the DeJope Property would not clearly be excluded (e.g., to change the January 1, 1983, cut-off date to coincide with the effective date of the statute or to set a later cut-off date).

of those terms. In other words, whatever "was designated" means as to "a reservation," it also means as to "trust land." Put the other way, it cannot reasonably be read as meaning "set aside for future approval" with regard to trust lands, unless it means the same thing for reservations. However, there is no indication that federal law recognizes an official status for land having received preliminary approval for reservation lands.[7]

¶ 30.  Reservations have been created by statute, agreement, executive order, and treaty. *See United States v. Dion*, 476 U.S. 734, 745 n.8 (1986). Trust land is created in accordance with federal regulations. The choice of the word "designated" in this statute is sensible because it encompasses the variety of methods by which land attains the distinction of reservation or trust land. Only when the applicable steps are completed does the land in question attain the status required by the statute.

¶ 31.  That is also a plausible reason to choose the word "designated" in the first place. The Nation argues that we must read the word "designated" as meaning land that has some preliminary and non-final approval; otherwise we render the words surplusage.[8] It is true that the legislature could have worded the statute a number of ways to accomplish what it intended. The statute could have been written without the word "designated." We do give effect to every word in a

---

[7] As the court of appeals noted, the relevant federal regulations never use the word "designated," so there is no helpful guidance to be found there. *Ho-Chunk Nation*, 312 Wis. 2d 484, ¶ 20.

[8] "[S]tatutes must be construed, if possible, so that no word or clause is rendered surplusage." *Hayne v. Progressive N. Ins. Co.*, 115 Wis. 2d 68, 339 N.W.2d 588 (1983).

statute. Giving effect to every word, however, does not require that we generate ambiguity where there is none evident in the context. Here we give effect to the word "designated" without reading it the way that the Nation asks. As noted above, sometimes the word with broader connotations is the better choice because its meaning encompasses the varied procedures that are involved. Here, for example, referring to land that has been "designated" a reservation covers reservations created in a variety of ways. To read the word "designated" otherwise, as loaded with great meaning and as conferring official status based on a nonfinal act, is to import unnecessary uncertainty into a straightforward statute.

¶ 32. As was noted previously, there is, in fact, a series of preliminary and tentative acts that are part of the process by which land becomes trust land, as a look at the relevant regulations makes clear. There are also obstacles in the process that may in some cases prove fatal to the transaction. The regulations discuss the potential effect of liens, for example, and give the Secretary of the Interior the authority to require that they be eliminated.[9]

¶ 33. These regulations require "approval of an instrument of conveyance" before the formal acceptance of the land in trust status is accomplished.[10] The deed

---

[9] "After having the title evidence examined, the Secretary shall notify the applicant of any liens, encumbrances, or infirmities which may exist. The Secretary may require the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition and he shall require elimination prior to such approval if the liens, encumbrances, or infirmities make title to the land unmarketable." 25 C.F.R. § 151.12 (1982).

[10] "Formal acceptance of land in trust status shall be accomplished by the issuance or approval of an instrument of

in the record, the instrument of conveyance here, shows that it was approved on January 31, 1983.

■

¶ 34. We briefly acknowledge additional arguments made by the parties concerning the appropriate canons of construction. The Nation argues that the statute should be construed liberally because it concerns Indian tribes. Under the "Indian canon of construction," statutes "passed for the benefit of dependent Indian tribes . . . are to be liberally construed, [with] doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca County, Minn.*, 426 U.S. 373, 392 (1976).

¶ 35. However, the DOR argues that courts have declined to apply the Indian canon where there was no ambiguity in the statute in the first place. *See Chickasaw Nation v. United States,* 534 U.S. 84, 95 (2001) (also noting that the Indian canon does not necessarily trump other canons of construction where they conflict and specifically mentioning the exemption canon). The DOR further argues that that is precisely the case here because the statute is the equivalent of an exemption statute, and it is well settled that statutes concerning exemptions, deductions, and privileges are strictly construed.[11]

conveyance by the Secretary as is appropriate in the circumstances." 25 C.F.R. § 151.13 (1982).

[11] "[T]ax exemptions, deductions, and privileges are matters purely of legislative grace and tax statutes are to be strictly construed against the granting of the same, and one who claims an exemption must point to an express provision granting such exemption by language which clearly specifies the same, and thus bring himself clearly within the terms thereof." *Comet Co. v. Dep't of Taxation,* 243 Wis. 117, 123, 9 N.W.2d 620 (1943). "An exemption from taxation must be clear and express. All pre-

¶ 36.   Because we hold that the statute is unambiguous when the provisions are read in context, it is not necessary to address the arguments concerning which canons of statutory interpretation would apply were the statute ambiguous. However, we note that even were we to hold that the statute is ambiguous, the bar would be set quite high for the Nation under the applicable canon of statutory construction:

> As a general rule courts have held that statutes exempting property from taxation should be strictly construed in favor of taxation, but should not be interpreted unreasonably. If the standard granting an exemption is capable of two interpretations, one granting exemption and the other denying it, the construction which denies the exemption must be adopted. The same rule has been applied to deductions.
>
>    . . . .
>
> Tax refund statutes must be construed strictly in favor of imposing the tax and against allowing the refund, and the burden is on the person requesting the refund to bring himself within the refund statute.

Norman J. Singer, 3A *Sutherland Statutory Construction* § 66:9 (6th ed. 2003) (citations omitted). It is clear to us that the Nation would have considerable difficulty meeting the burden of overcoming the countervailing exemption canon, especially considering the way the United States Supreme Court in *Chickasaw Nation* signaled the Indian canon's loss of strength.

sumptions are against it, and it should not be extended by implication." *Soo Line R.R. Co. v. DOR,* 89 Wis. 2d 331, 359, 278 N.W.2d 487 (Ct. App. 1979), *aff'd,* 97 Wis. 2d 56, 292 N.W.2d 869 (1980). *See also Ladish Malting Co. v. DOR,* 98 Wis. 2d 496, 502, 297 N.W.2d 56 (Ct. App. 1980).

## IV. CONCLUSION

¶ 37. For the reasons set forth above, we affirm. "[R]eservations or trust lands" are also referred to in the sentence immediately preceding the provision in question; a sensible reading of the statute (Wis. Stat. § 139.323) requires that the two references be read as identifying the same land. The grammatical construction of the sentence itself lends further support to our holding because "was designated" precedes both "a reservation" and "trust land" and means the same thing about each. Given that there is no basis in the federal regulations for recognizing a preliminary, unofficial status for reservations or trust lands, there is likewise no basis for reading this statute as intending to apply to land that has received only preliminary informal approval.

¶ 38. We therefore hold that in this context the phrase "was designated a reservation or trust land" is necessarily read as referring to the applicable formal process that must occur in order for land to be a reservation or trust land. Because the proper authorities had not completed the necessary steps for the property in question to be designated a reservation or trust land on or before January 1, 1983, and because that is required in order to qualify for the tax refund, the claim was properly denied.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 39. DAVID T. PROSSER, J. (*dissenting*). Wisconsin law requires the Wisconsin Department of Revenue to refund 70 percent of the state excise tax on cigarettes that an Indian tribe collects for the state on its reservation or trust lands, provided that "[t]he land on which

the sale occurred was designated a reservation or trust land on or before January 1, 1983." Wis. Stat. § 139.323(3) (2007–08).[1] If the land on which the sale occurred was not designated a reservation or trust land on or before January 1, 1983, the state keeps the entire tax.

¶ 40.   In this case, the Ho-Chunk Nation seeks a refund of 70 percent of the tax collected on its DeJope trust land on the east side of Madison in Dane County. The issue presented is whether this property "was designated . . . trust land on or before January 1, 1983." *Id.*

¶ 41.   The answer to this question turns on the meaning of the word "designated." The majority opinion is grounded on the premise that the phrase "was designated . . . trust land" means exactly the same as the phrase "was trust land"—that is, the word "designated" really means nothing in the context of the passage in which it appears. *See* majority op. ¶¶ 2–4. Because I disagree, I respectfully dissent.

I

¶ 42.   Wisconsin Stat. § 139.323 has an interesting history, and understanding that history is essential to understanding the statute.

¶ 43.   In the late 1970s, Wisconsin imposed an occupational tax on the sale of cigarettes. Wis. Stat. § 139.31 (1979–80). The nature of the tax was problematic when the tax was applied on Indian reservations. In a May 1979 opinion, Attorney General Bronson La Follette advised the Department of Revenue that Wisconsin's cigarette tax laws did not apply to Indian

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

persons or Indian tribes selling cigarettes on Indian reservations. 68 Wis. Op. Att'y Gen. 151 (1979).

¶ 44. The Attorney General's opinion materially advantaged Indian smoke shops, where tribes sold cigarettes to both Indians and non-Indians without imposition of a state cigarette tax.

¶ 45. By 1981 non-Indian merchants began to complain about the loss of cigarette sales to tax exempt tribal smoke shops, and the state began to notice the loss of cigarette tax revenue. "The Legislative Fiscal Bureau said about 11,000 cases of untaxed cigarets were sold by 'tribal smokeshops' in 1979 and 1980." Eldon Knoche, *Revenue Loss in Sale of Cigarets*, Milwaukee Sent., May 2, 1981 (on file with the Legislative Reference Bureau, Madison, Wisconsin). The newspaper reported that non-Indians "apparently are flocking to the tribes to buy the cigarets minus the tax of 16 cents a pack, or $1.60 a carton." *Id.*

¶ 46. Legislation was soon introduced to convert Wisconsin's cigarette tax from an occupational tax to an excise tax. *See* 1981 A.B. 500 (introduced May 14, 1981). This legislation was based on *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 151–160 (1980), where the Supreme Court upheld Washington's excise tax on on-reservation sales of cigarettes to non-tribal purchasers.

¶ 47. In 1982 the Joint Committee on Finance incorporated a cigarette excise tax into its revision of 1981 Senate Bill 783, the so-called budget adjustment bill. *See* Senate Substitute Amendment 1 to 1981 S.B. 783. The Committee's provision exempted cigarettes sold to enrolled tribal members. *See id.*

¶ 48. Governor Lee Sherman Dreyfus vetoed the provision. However, in his April 29, 1982 veto message, Dreyfus said the following:

I am vetoing conversion of the current occupational tax on cigarettes to an excise tax effective July, 1983. Sale of unstamped cigarettes to non-Indians is a serious and mounting problem in Wisconsin with an estimated revenue loss of more than $4 million annually. There is no question that state government and Wisconsin's tribes must have serious discussions to resolve this and other tax problems. However, such negotiations are more likely to be conducted in "good faith" if a forced mid-1983 solution is not in the statutes. The tribes should understand that the intent of the Legislature to end the serious erosion of our cigarette tax base is absolutely clear. A comprehensive and fair solution to state-tribe tax problems must be found and soon, or the legislature will re-enact this law.

Veto message of Lee Sherman Dreyfus, Governor, 1981 S.B. 783 (April 29, 1982) (on file with the Legislative Reference Bureau, Madison, Wisconsin).

¶ 49. During the remainder of 1982, representatives of the Department of Revenue met with representatives of Wisconsin's 11 Indian tribes and bands, attempting to come up with an agreement. These negotiations are summarized in the minutes of the Wisconsin Legislative Council's Native American Study Committee. *See* Wisconsin Legislative Council, Summary of Proceedings, Native American Study Committee, for May 12, 1982, at 4–5; July 19, 1982, at 11–12; and November 15, 1982, at 6–8, 10.

¶ 50. In 1983 Governor Anthony Earl's first budget contained language to implement the agreement negotiated by the previous administration. *See* 1983 S.B. 83, §§ 1496–1506. A March 24, 1983 analysis for the Joint Committee on Finance described the provision as follows:

> Senate Bill 83 (the 1983–85 biennial budget bill) contains language to implement a recently-negotiated

574

agreement between the Department of Revenue and representatives of Indian tribes in the state, which would require Indian sellers of cigarettes to impose a portion of the state cigarette tax on sales to non-Indians. This would be accomplished by converting the current cigarette occupational tax to an excise tax, to be imposed on the first taxable event in the state and passed on to the ultimate consumer. Under the negotiated agreement . . . cigarettes sold by distributors to Indians or Indian organizations for resale would be exempt from 70% of the state excise tax (i.e., subject to a tax of 7.5¢ per pack), and payment of the non-exempt portion would be evidenced by the appropriate tax stamp purchased by distributors and affixed to each pack sold to Indian sellers for resale. According to the language of SB 83, this special tax rate would only be applicable if a tribe imposed an additional 7.5¢ per pack tax of its own; otherwise, the full amount of excise tax would be due. The use tax imposed by current law on unstamped cigarettes brought into the state would not apply to cigarettes taxed at the special rate for Indians. In addition, the Department of Revenue would be authorized to enter into agreements with Indian tribes to provide refunds of cigarette taxes paid through the purchase of stamped cigarettes by Indians. The Department would adopt administrative rules regarding the refund provision, specifying the tribal alternatives of maintaining separate records of sales to Indians, or agreeing to a formula for determining the refund amount (for example, Wisconsin per capita cigarette consumption multiplied by the reservation population).

Memorandum from Bob Lang, Director, Legislative Fiscal Bureau, to Members, Joint Committee on Finance, at 2 (March 24, 1983) (regarding 1983–85 Biennial Budget: Cigarette Tax—Sale of Untaxed Cigarettes by Indians to Non-Indians) (on file with the Legislative Reference Bureau, Madison, Wisconsin).

¶ 51. The fiscal paper noted that the proposal came in response to the fact that "the state is not currently collecting any significant cigarette tax revenues on sales by Indians to non-Indians, and this creates a price differential potentially equal to the amount of tax (25¢ per pack) between sales to non-Indian purchasers by Indians and sales by non-Indian retailers." *Id.* at 3.

¶ 52. The paper added that, since December 1978, "untaxed cigarettes have been sold by Indians currently operating from about twenty sites on reservations and two on Tribal trust lands." *Id.*

(Tribal trust lands are property purchased by Indians or tribes and deeded to the U.S. Department of the Interior's Bureau of Indian Affairs, and treated as reservation land for many purposes. The Attorney General has indicated that such lands are treated as reservation land for purposes of cigarette taxes.)[2] The highest sales have reportedly been in the Green Bay area (Oneida tribe), Wisconsin Dells (Winnebago tribe) and on the Lac Court Oreilles reservation in northwest Wisconsin. Sales of untaxed cigarettes by Indians have grown from approximately 264,000 cartons in 1979–80 to over 1,480,000 cartons in 1981–82, and are expected to reach 2,280,000 cartons in 1982–83. Most of these sales are to non-Indians, and the cigarette tax revenue not collected on such taxable sales is estimated at nearly $5.2 million in 1982–83, increasing between 40% and 50% per fiscal year. Based on current experience with deliveries of unstamped cigarettes to Indian sellers, foregone cigarette tax collections are estimated to

[2] Attorney General La Follette issued an opinion on March 10, 1982, that land purchased and held in trust for Indian tribes or tribal members under the superintendence of the federal government has the same status as official reservation land. 71 Wis. Op. Att'y Gen. 82 (1982).

be $7.7 million in 1983–84 and $11.0 million in 1984–85. In addition, foregone sales tax collections on these purchases would be approximately $1.2 million in 1982–83, $1.7 million in 1983–84, and $2.5 million in 1984–85.

*Id.* at 3–4.

¶ 53. On April 19, 1983, a subcommittee of the Joint Committee on Finance proposed a revision of the Governor's budget proposal. In line with present law, it called for imposition of a full excise tax (e.g., 25 cents a pack) on Indian cigarette sales but provided a 70 percent refund to the tribes. *Plan Would Alter Cigaret Tax Rule,* Milwaukee Sent., April 20, 1983 (on file with the Legislative Reference Bureau, Madison, Wisconsin).

¶ 54. Carrying a new name, the Legislative Council's American Indian Study Committee met on April 22, 1983, and discussed these developments in the Joint Finance Committee. It voted unanimously to support the Finance subcommittee's proposal *after* learning from Kenneth Funmaker, Sr., a member of the Winnebago tribe (now Ho-Chunk Nation) that the tribe had acquired "land in the Town of Blooming Grove, Dane County, for purposes of establishing a smokeshop." Wisconsin Legislative Council, Summary of Proceedings, American Indian Study Committee, for April 22, 1983, at 10–11. Three members of the committee who voted to support the proposal (Jim Schlender, Rita Keshena, and Gerald Hill) were members of the Great Lakes Inter-Tribal Council (GLITC) team that negotiated the original cigarette tax agreement with the Department of Revenue. *See* Letter from Patricia S. Smith, Chairperson, American Indian Study Committee, State of Wisconsin Legislative Council, to Senator Gerald D. Kleczka and Representative Mary Lou Munts, Co-Chairpersons of the Joint Committee on

577

Finance (May 4, 1983) (on file with the Legislative Reference Bureau, Madison, Wisconsin).

¶ 55. The Joint Committee on Finance ultimately approved the recommendation of its subcommittee. It introduced a substitute amendment to the budget on May 26, 1983. The budget was enacted by the legislature on July 1, 1983, and became law after its publication on July 22, 1983. 1983 Act 27; *see also* Bulletin, Wisconsin Legislature, Part 1 Senate, Senate Bill 83, at 35–41 (1983).

II

¶ 56. The majority opinion sets out several key dates for the property in question:

> In 1982, the Ho-Chunk Nation (the Nation)... received permission from the United States Department on the Interior, Bureau of Indian Affairs (BIA), to acquire a five-acre parcel of land known as the DeJope Property. A Washington, D.C., BIA official sent a memo dated August 20, 1982, to a Minneapolis BIA official, stating in relevant part, "You are, therefore, authorized to accept conveyance to the United States in trust upon consideration of appropriate title evidence in accordance with the requirements of 25 CFR 120a.12 [1982]." On October 29, 1982, the seller of the DeJope Property received payment from the Nation and conveyed the title by delivery of a warranty deed. On January 31, 1983, the Minneapolis BIA Area Director signed the deed, accepting the conveyance. The deed was recorded with the Dane County Register of Deeds on March 18, 1983.

Majority op., ¶ 6.

¶ 57. These dates must be compared to the dates related to Wis. Stat. § 139.323: (1) 1983 Senate Bill 83 was introduced on February 8, 1983, eight days after

the January 31, 1983 date that the majority considers controlling; (2) a Joint Finance subcommittee proposed the pertinent revision to the budget on April 19, 1983, 78 days after the date that the majority believes is controlling; and (3) the 1983–85 budget became law on July 23, 1983, 173 days after the date the DeJope property officially went into trust, although § 139.323 did not take effect until October 1, 1983. By October 1, 1983, the DeJope property had been in trust for eight months.

¶ 58. From the perspective of the state, Wis. Stat. § 139.323 was a generous accommodation to Wisconsin Indian tribes because it permitted tribal governments to secure 70 percent of all excise tax collected on the sale of cigarettes to non-tribal purchasers on tribal land. Under this formula, tribal revenues would automatically increase every time the state raised the cigarette tax. Because tribes had the ability to acquire additional land, put it into trust, and use it to facilitate additional cigarette sales, the Joint Committee on Finance must have concluded that it had to cut off new land for Indian smoke shops to prevent further erosion of the state's cigarette tax base. This appears to be the reason for the January 1, 1983 cutoff date.

¶ 59. Budget writers knew full well that the budget would not be passed overnight. Hence, they had to devise a statutory obstacle to the designation of *new* trust land before the budget became law. A cutoff of January 1, 1983, served that purpose.

¶ 60. The legislature could easily have said the following in Wis. Stat. § 139.323:

(3) The land on which the sale occurred was reservation or trust land on or before January 1, 1983.

However, *that* language would have excluded the DeJope property that had become trust land *before* the

579

budget provision was even conceived and had been purchased by the Ho-Chunk Nation—with explicit prior approval of the BIA—long before January 1, 1983.

¶ 61.  Inasmuch as tribal legislators from the GLITC Cigarette Committee included a Ho-Chunk representative (Harry Steindorf), *see* Memorandum from Wisconsin Judicare—Indian Unit to Members of the GLITC Cigarette Committee (October 18, 1982) (on file with the Legislative Reference Bureau, Madison, Wisconsin), it is implausible that committee members were unaware of the plans of the Ho-Chunk Nation for the DeJope Property. It is implausible that key leaders in the legislature, the executive branch, and among the tribes *deliberately excluded* from cigarette tax refund eligibility five acres of property that had been owned by the Ho-Chunk Nation since October 29, 1982, and had been officially in trust since January 31, 1983, before the legislation was passed.

¶ 62.  To accept the majority opinion requires us to believe that in 1983 all relevant decision makers, except the Ho-Chunk, knowingly and deliberately excluded the DeJope Property—even though it already had trust status—without any documentation of such intentional discrimination.

¶ 63.  The majority's statutory analysis must be considered against this background.

### III

¶ 64.  The majority opinion rejects the conclusion of both the court of appeals and the circuit court that Wis. Stat. § 139.323 is ambiguous in the context of this dispute. *See* majority op. ¶¶ 21–22, 26. It makes this determination even though it acknowledges that the word "designate" has multiple definitions. The majority opinion states the following:

The court of appeals noted that dictionary definitions of the word [designate] led to opposite interpretations: "The definitions the Nation chooses—'select' and 'nominate,' *see* B[lack's] L[aw] D[ictionary] 447 (6th ed. 1990)—have a preliminary sense to them that would support the Nation's proposed construction. However, the definitions 'specify,' 'give a name or title to,' and 'characterize,' *see* A[merican] H[eritage] C[ollege] D[ictionary] 376 (3d ed. 1993), suggest that the property would need to actually be held in trust before the property could be so specified, named, titled or characterized."

*Id.*, ¶ 22 n.5 (quoting *Ho-Chunk Nation v. DOR*, 2008 WI App 95, ¶ 16, 312 Wis. 2d 484, 754 N.W.2d 186).

¶ 65. The American Heritage Dictionary includes among the definitions of "designate" the following: "To select and set aside for a duty, an office, or a purpose." *American Heritage Dictionary* 506 (3d ed. 1992). This definition is illuminated by focusing on the adjective "designate"—"Appointed but not yet installed in office." *Id.*

¶ 66. To illustrate the use of the word "designate" to signal a probability, a possibility, or even a contingency, we can look to a statement issued by the White House on January 20, 2009:

> In order to ensure continuity of government, Defense Secretary Robert Gates has been designated by the outgoing Administration, with the concurrence of the incoming Administration, to serve as the designated successor during Inauguration Day, January 20th.

Press Release, The White House, Office of the Press Secretary (January 20, 2009). In short, Secretary Gates was designated to become President of the United States if the higher ranking officials slated by statute to succeed the President in the event of a disaster were

unable to do so. Of course, Secretary Gates was never elected President and never became President, but he undoubtedly was designated successor to the President for one day.

¶ 67. This use of the phrase "was designated" is wholly consistent with the Ho-Chunk's position. On August 20, 1982, BIA "designated" the DeJope property as property it would accept in trust status. On October 29, 1982, the Nation received title to the property, and thereafter, in documents conveyed to the BIA, the Nation again "designated" the property as property set aside for trust status. On December 7, 1982, the Great Lakes BIA office sent a memo and forwarded a deed to the Minneapolis BIA office for the Area Director's signature, following up BIA's earlier designation.

¶ 68. The majority rejects this use of the word. It acknowledges that the word "designated" is not part of the federal regulations, but it insists upon use of the word as though the word identified the critical decision point in a formal process.

¶ 69. Subchapter II of Chapter 139 of the Wisconsin Statutes deals with cigarette taxes. Section 139.30 sets out a series of definitions, including "Indian tribe," § 139.30(5), "Reservation," § 139.30(9) and "Trust lands," § 139.30(13m), that are employed in the subchapter.

¶ 70. "Trust lands" are defined as "any lands in this state held in trust by the U.S. government for the benefit of a tribe or a member of a tribe." Wis. Stat. § 139.30(13m).

¶ 71. This definition does not help the State in its interpretation of the word "designated." Under the statute, "trust lands" *are* lands "held in trust by the U.S. government." *Id.* The word "designated" does not appear in the Wisconsin definition and the phrase "was

designated" does not add anything when the phrase is used with respect to an already existing status.

¶ 72. The fact is, however, that this "trust lands" definition was not enacted until 1999. 1999 Wis. Act 9. Hence, the meaning of "trust land" in 1983 was not confined by a Wisconsin statutory definition. Turning to federal law would make sense *if* there were evidence that the legislature relied on a delineated federal process or if the word "designated" appeared in the federal regulations. There does not appear to be such evidence.

¶ 73. What the legislature was familiar with was a 1982 opinion from Attorney General La Follette. *See* 71 Wis. Op. Att'y Gen. 82 (1982). Among the statements La Follette made in his opinion are the following:

> Regardless of how land came to be reserved for Indian use by the federal government, the legal status of such reserved land is the same.

*Id.* at 83 (citation omitted).

> It also appears to make no difference whether the land in question is held in trust by the United States for the use of an Indian tribe or an individual tribe member, as with allotments, *or whether the tribe holds the fee title to the land.*

*Id.* at 85 (emphasis added).

¶ 74. Attorney General La Follette's opinion explains as follows:

> In the leading case on cigarette taxes involving sales by · Indians within reservation boundaries, *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463 (1976), the Court made clear that for purposes of taxation jurisdiction, all lands located within the exterior boundaries of an Indian reservation would be treated the same. The Court did not distinguish between land located within the reser-

583

vation *which remained in trust status,* either for the tribe or individual tribe members, *and land that* had been alienated and *is now owned in fee by Indians* or non-Indians. *The [C]ourt refused to distinguish between fee and trust lands* because it considered "checkerboard jurisdiction" within reservation boundaries to be unworkable.

*Id.* at 86 (emphasis added).

¶ 75. This latter passage is significant because it shows that land within the boundaries of a reservation need not be "reservation" or "trust land" to be treated as such. The statutory definition of "reservation" in Wis. Stat. § 139.30(9) mirrors this principle.[3] Thus, Wis. Stat. § 139.323 authorizes a 70 percent refund of excise taxes on cigarettes sold on land within the boundaries of an Indian reservation, even though the land is *not* "held in trust by the U.S. government for the benefit of a tribe or member of a tribe."

¶ 76. Wisconsin Stat. § 139.323 begins with the following statement: "The department shall refund 70% of the taxes collected under s. 139.31(1) in respect to sales on reservations or trust lands of an Indian tribe . . . ." This provision employs the definitions in § 139.30 to cover all land within a reservation's boundaries and all trust land—that is, all land being held in trust *at the time of the sale.* The phrase "was designated" in subsection (3) looks backward to a different time. In that context, the word "designated" is either superfluous or it conveys a different meaning. There is no reason why the legislature would not have used the

---

[3] " 'Reservation' means all land within the boundaries of the Bad River, Forest County Potawatomi, Lac Courte Oreilles, Lac du Flambeau, Menominee, Mole Lake, Oneida, Red Cliff, St. Croix, and Stockbridge-Munsee reservations and the Winnebago Indian communities." Wis. Stat. § 139.30(9).

phrase "*was* a reservation or trust land on or before January 1, 1983," unless the word "designated" had special meaning. The phrase "reservation or trust land" and the phrase "land . . . designated a reservation or trust land" are not likely to mean exactly the same thing.

¶ 77. Unlike this dissent, the majority opinion does not justify its holding on any historical or policy basis. It relies instead on unpersuasive interpretive tools. In my view, the only way we would be justified in denying the Ho-Chunk Nation the requested refund on its DeJope tax collections would be to cite documentary evidence showing that this property was considered and intentionally excluded.

¶ 78. For the reasons stated, I respectfully dissent.

¶ 79. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON and JUSTICE ANN WALSH BRADLEY join Section III of this dissent.